Harvey D. WILLIAMS, Petitioner,

v.

Nathan NEVELOW, Trustee, Respondent.

No. B–4263.

Supreme Court of Texas.

July 24, 1974.

Rehearing Denied Oct. 2, 1974.

Dibrell, Dotson & Dibrell, Samuel D. Dibrell, San Antonio, Graves, Dougherty, Hearon, Moody & Garwood, W. Amon Burton, Jr., Austin, for petitioner.

Kampmann, Church, Burns & Brenan, William C. Church, Jr., San Antonio, for respondent.

REAVLEY, Justice.

Highway Drilling Company, Inc., a Texas corporation, repurchased its own stock from Harvey D. Williams. It gave a promissory note for the purchase price and executed a security agreement covering its personal property to assure payment of the note. At the time of the exchange of the promissory note for the stock, the corporation was solvent and had unrestricted earned surplus in excess of the amount of the note. After the corporation became insolvent, the holder of the note foreclosed upon certain personal property pursuant to the security agreement. The lower courts have set aside the foreclosure and sale in favor of the corporation's trustee in bank-

ruptcy. 501 S.W.2d 942. We disagree; we uphold the stock repurchase, the security agreement, and the foreclosure.

On December 20, 1968 the Board of Directors of Highway Drilling, Inc. passed a unanimous resolution, which was thereafter confirmed and adopted by all shareholders, authorizing the purchase by the corporation of 1,164 shares of its own stock from Harvey D. Williams. Pursuant to this resolution and shareholder approval, the corporation issued to Harvey D. Williams a promissory note dated December 20, 1968, in the principal sum of $100,691.00 bearing 4% interest. The note was payable in 84 monthly installments beginning on February 15, 1969, of $335.64 each, covering interest only, followed by 36 monthly installments of $2,972.81 each. The note was secured by: (1) the equipment, tools, inventory and personal property of the corporation; (2) a pledge of the certificate evidencing ownership of the 1,164 shares; and (3) by two life insurance policies, each in the principal sum of $50,000.00, covering the life of Harvey D. Williams. The corporation executed a security agreement covering all the personal property owned by the corporation to secure payment of the note.

In October and November of 1969 the corporation was in default in payments due on the note, and news reached Williams that the corporation was in serious financial difficulty. He gave notice that a public sale would be held on December 29, 1969, pursuant to the terms of the security agreement, and certain property was purchased at the sale by Williams for the sum of $20,000.00. While there is some controversy as to the market value of the property acquired at the sale, there is no evidence that its value exceeded the amount owed to Williams by the corporation on the promissory note. Williams has made no claim for any deficiency in the bankruptcy proceeding.

The corporation filed a voluntary petition in bankruptcy in federal court in February of 1970, and thereafter Nathan Nevelow was appointed trustee in bankruptcy on March 17, 1970. Nevelow filed this suit on November 1, 1971 to set aside the foreclosure sale. In a trial before the court, judgment was rendered for Nevelow setting aside the sale. The trial court's pertinent findings of fact were: (1) that on December 30, 1968, the retained earnings of the corporation were $140,633.17; (2) that the claims of creditors represented by Nevelow were incurred after December 23, 1968; and (3) that Harvey D. Williams in November 1969 had notice that the corporation did not have money to continue doing business, could not pay its creditors, could not make the installment payments due on the $100,691.00 note, and that the filing of a voluntary petition in bankruptcy was contemplated.

Prior to the adoption of modern business corporation statutes, courts were inclined to be suspicious, if they permitted, the repurchase by a corporation of its own stock. Dodd, Purchase and Redemption By a Corporation of Its Own Shares: The Substantive Law, 89 U.Pa.L.Rev. 697 (1941). Texas courts upheld the authority of a solvent corporation to do so. San Antonio Hardware Co. v. Sanger, 151 S.W. 1104 (Tex.Civ.App.1912, writ ref'd). In those cases where the payment of the purchase price was deferred, or where a promissory note was given by the corporation for the stock, the majority rule was to require solvency not only at the time when the transaction was closed and the note was issued but also at the time of the payment of cash to discharge the corporate obligation. Robinson v. Wangemann, 75 F.2d 756 (5th Cir. 1935); Anno: Corporation—Acquisition of Owned Stock, 47 A.L.R.2d 758, 774 (1956). The court in Robinson v. Wangemann held that the claim of the holder of a note received for repurchased stock was subordinate to the claim of the other creditors for the reason that the transaction by which a corporation repurchased its stock was not really a sale but was a method of

distributing a portion of the assets to the stockholder. So the court held:

> When such a transaction is had, regardless of the good faith of the parties, *it is essential to its validity* that there be sufficient surplus to retire the stock, without prejudice to creditors, at the time payment is made out of assets. 75 F.2d 757. (Emphasis added.)

This rule, designed to protect against prejudice to creditors, prevented the corporation from making a valid *transfer of any asset* for this purpose unless at the time of the transfer the solvency and the surplus of the corporation would not be impaired. The lower courts have both based the holding in favor of the trustee in this case on the rule of Robinson v. Wangemann. Assuming this to have been the rule in Texas prior to 1955, the passage of the Texas Business Corporation Act, V.A.T.S., in that year is inconsistent with the rationale and the holding of Robinson v. Wangemann. The pertinent part of Article 2.03 of that Act from 1955 to 1973 provided as follows:

> A. A corporation shall not purchase directly or indirectly any of its own shares unless such purchase is authorized by this Article and not prohibited by its articles of incorporation.
>
> \*    \*    \*    \*    \*    \*
>
> C. Upon resolution of its board of directors authorizing the purchase and upon compliance with any other requirements of its articles of incorporation, a corporation may purchase its own shares to the extent of unrestricted earned surplus available therefor if accrued cumulative preferential dividends and other current preferential dividends have been fully paid at the time of purchase.
>
> \*    \*    \*    \*    \*    \*
>
> E. To the extent that earned surplus, capital surplus or reduction surplus is used as the measure of the corporation's right to purchase its own shares, such

surplus shall be restricted so long as such shares are held as treasury shares, and upon the disposition or cancellation of any such shares the restriction shall be removed pro tanto as to all of such restricted surplus not eliminated thereby.

> F. In no case shall a corporation purchase its own shares when there is a reasonable ground for believing that the corporation is insolvent, or will be rendered insolvent by such purchase or when, after such purchase, the fair value of its total assets will be less than the total amount of its debts.

■ Bearing in mind that the statute does not purport to encompass equitable grounds for setting aside a transaction, the Corporation Act by the quoted language provides that the corporation may purchase its own shares to the extent of unrestricted earned surplus available *at the time of the purchase* (in the absence of unpaid preferential dividends or added restrictions in the articles of incorporation). The statute also provides that no purchase may be made when such purchase will render the corporation insolvent. Thus the validity of the transaction and the authority of the corporation to repurchase its shares are determined at the time of the purchase, and the statute places no restriction upon the transfer of cash or other assets at a subsequent date.

The "purchase" of the stock by Highway Drilling Company took place in December of 1968. A purchase is the voluntary transmission of property from one person to another in exchange for a valuable consideration. Cobb v. Webb, 26 Tex.Civ. App. 467, 64 S.W. 792 (1901, writ ref'd); Spur Independent School Dist. v. W. A. Holt Co., 88 S.W.2d 1071 (Tex.Civ.App. 1935, no writ). No statute is known to use the term "purchase" to mean the act by which the buyer finally parts with tangible property and not to mean a consummated trade which may be the unconditional exchange of a promissory note for stock.

See V.T.C.A., Bus. & Comm. C. § 1.-201(32); V.A.T.S. Tax.-Gen. Art. 20.01 (G).

A contrary construction of the time and meaning of "purchase" would be inconsistent with Article 2.03(E). The statute there provides, in part, that earned surplus used as the measure of the right of the corporation to purchase its own shares, need be maintained only until the purchased shares are disposed of by the corporation—whether or not its promissory note is then unpaid. If it were held that the corporation must have a surplus when the cash payment is made on the note, the effect would be to require as much as double the amount of the surplus as the price paid for the stock.

This case is determined by the statutory authority or power of the corporation to reacquire shares. If fraud or bad faith or conduct misleading to the creditors were shown, equitable ground for recission of the purchase and the foreclosure would be established. 1 G. Hornstein, Corporation Law & Practice, § 495 (1959). Contentions have been made of this nature in the present case. They are based on provisions in the note of the corporation related to a note in the amount of $186,000.00 given by three directors of the corporation to the same Harvey Williams for their purchase of 2,136 shares in the corporation. It was provided that the corporation's note could not be prepaid as to any part or portion of principal or interest until the other $186,000.00 promissory note had been fully paid and, in addition, that upon default of payment on the $186,000.00 note, the note of the corporation could be matured at the option of the holder. It is argued that these provisions had the effect of pledging the assets of the corporation as a security for the personal note as well as for the obligation of the corporation. That is not the case, since payment of the corporation's note would fully terminate any security interest affecting its property. These provisions do not impair the negotiability of the corporation's note. Section 3.-105(a)(3) of the Texas Business and Commerce Code provides that a promise or order that is otherwise unconditional is not made conditional by the fact that the instrument "refers to a separate agreement for rights as to prepayment or acceleration." The record in this case raises no issue of bad faith and does not justify the contention that the stock repurchase transaction in itself had any effect upon the subsequent creditors or contributed in any manner to the bankruptcy of the corporation.

Some courts have retained the common law rule as to the effect of corporation repurchases despite the enactment of the Model Corporation Act or comparable statutory language. McConnell v. Estate of W. H. Butler Const. Co., 402 F.2d 362 (9th Cir. 1968); In re Peoples Loan & Investment Co., 316 F.Supp. 13 (W.D.Ark.1970). We read the statute to require a contrary result. *See* Palmer v. Justice, 322 F.Supp. 892 (N.D.Tex.), aff'd *per curiam,* 451 F.2d 371 (5th Cir. 1971); Tracy v. Perkins-Tracy Printing Co., 278 Minn. 159, 153 N. W.2d 241 (1967); Hartmann and Wilson, Payment for Repurchased Shares Under the Texas Business Corporation Act, 26 Sw.L.J. 725 (1972); Herwitz, Installment Repurchase of Stock: Surplus Limitations, 79 Harv.L.Rev. 303 (1965).

We note that Sec. F of Art. 2.03 of the Texas Business Corporation Act was amended in 1973 to include the emphasized language below which was added by its draftsmen to the Model Business Corporation Act in 1957:

F. In no case shall a corporation purchase *or make payment, directly or indirectly,* for its own shares when there is reasonable ground for believing that the corporation is insolvent, or will be rendered insolvent by such purchase or *payment,* or when, after such purchase, *or payment,* the fair value of its total assets will be less than the total amount of its debts.

The addition of "payment" indicates some distinction between "payment" and "purchase." It does not necessarily follow that a different result would be reached in the present case if the amended language of the statute with reference to the solvency of the corporation were applicable. The issuance of a secured negotiable instrument could be considered "payment" for the repurchased stock. Hartmann and Wilson, supra, 26 Sw.L.J. 725, 735. A decision on this point is not necessary to the disposition of the present case. In view of the historical judicial prohibition against enforcement of otherwise unconditional promises of payment after the time of insolvency, it would be well for the Legislature to settle the question expressly.

The judgments of the lower courts are reversed; judgment is here rendered that Nathan Nevelow, Trustee, be denied all recovery against Harvey D. Williams.